UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | | |
|---|---|---|
| Tom Schmidt, individually and on behalf of all others similarly situated, | § § § | |
| Plaintiff, | § § | No. ___1:17-cv-1294___ |
| v. | § § | **CLASS ACTION COMPLAINT** |
| Bayerische Motoren Werke AG, BMW North America, LLC, Volkswagen AG, Volkswagen Group of America, Inc., Audi AG, Audi of America, LLC, Dr. Ing. h.c. F. Porsche AG, Porsche Cars of North America, Inc., Daimler AG, and Mercedes-Benz USA, LLC, | § § § § § § § § | JURY TRIAL DEMANDED |
| Defendants. | § § | |

Plaintiff brings this action on behalf of himself and all others similarly situated, against (1) the Defendants collectively known as "Volkswagen": Volkswagen AG and Volkswagen Group of America, Inc.; (2) the Defendants collectively known as "Audi": Audi AG and Audi of America, LLC; (3) the Defendants collectively known as "Porsche": Dr. Ing. h.c. F. Porsche AG, and Porsche Cars of North America, Inc.; (4) the Defendants collectively known as "Daimler": Daimler AG and Mercedes-Benz USA, LLC; and (5) the Defendants collectively known as "BMW": Bayerische Motoren Werke AG and BMW North America, LLC. Plaintiff alleges the following based upon information and belief, the investigation of counsel, and personal knowledge as to the factual allegations pertaining to himself:

## I.    INTRODUCTION

1.    For decades, the leading German Automobile manufacturers managed to build brands that were the envy of the automotive world.  Volkswagen, Audi, Porsche, Daimler

1

(Mercedes), and BMW (collectively, the "German Five") built reputations based on technological prowess, innovation, and fierce competition for the hearts and minds of automobile dealers and consumers.  For at least the past two decades, those reputations have been built on a lie.

2.　　From at least 1996 to the present, the German Five entered into a conspiracy designed to eliminate competition between the manufacturers and to increase their profit margins.  The German Five's executives and employees met literally thousands of times over the past twenty years.  They shared highly sensitive technical information on virtually every aspect of automobile engineering.  They reached numerous agreements designed to prevent competition for new and innovative features and designs.

3.　　From an economic perspective, the German Five's unlawful agreement inevitably resulted in excess profits from stifling innovation.  In a competitive market, less innovative products sell at lower prices, all else being equal.  As such, a firm opting to reduce costs by offering less innovative features would have to accept lower prices, as more innovative competitors are able to sell to those customers who are willing to pay for the innovative features (often at a premium).  In a competitive automobile manufacturing market, where companies introduce product improvements every year, the effects of failing to innovate compound each year, such that the price gap between innovative and non-innovative products widens over time.

4.　　As a result, while the German Five padded their coffers, their American dealerships were forced to pay artificially high prices for cars manufactured by the companies.  Thousands of German Automobile dealerships paid "a much too high price" for the vehicles they purchased.[1]

---

[1] *Deutsche Presse-Agentu* a/k/a *German Press Agency*, *EU-Kartellwächter prüfen Vorwürfe gegen Autobauer*, Süddeutsche Zeitung (July 24, 2017), http://www.sueddeutsche.de/news /wirtschaft/auto-eu-kartellwaechter-pruefen-vorwuerfe-gegenautobauer-dpa.urn-newsml-dpa-com-20090101-170722-99-350077; *see also* Sven Egenter and Benjamin Wehrmann, *"The*

5.      Plaintiff Tom Schmidt, brings this suit on behalf of himself and a class of American dealerships for the damages they suffered by paying too much for German Five automobiles. Plaintiff and the Direct Purchaser Class also seek injunctive relief.   Plaintiff and the Direct Purchaser Class bring these claims under the Sherman Act (15 U.S.C. §§ 1–7) and the Clayton Act (15 U.S.C. §§ 12–27).

## II.      PARTIES

### A.      Plaintiff

6.      Plaintiff Tom Schmidt bought, owned, and operated a Volkswagen dealership called Ed Schmidt Auto, Inc. in Perrysburg, Ohio from 1989 to 2015.  Tom Schmidt is a citizen of Ohio, and Ed Schmidt Auto, Inc. is a corporation organized and operated under the laws of the State of Ohio.  Plaintiff, through his dealership, purchased Volkswagen vehicles directly from Volkswagen AG and Volkswagen Group of America, Inc.  Plaintiff paid an illegal premium for the vehicles he purchased.

### B.      Defendants

### Volkswagen Defendants

7.      **Volkswagen AG** is a German corporation with its principal place of business in Wolfsburg, Germany. It is one of the largest automobile manufacturers in the world, and is in the business of designing, developing, manufacturing, and selling automobiles. Volkswagen AG is the parent corporation of (among others) Audi AG, Porsche AG, and the American subsidiaries of all three brands. According to Volkswagen AG, it sold 10.3 million cars worldwide in 2016, including 6.47 million Volkswagen-branded cars, 1.87 million Audi-branded cars, and over 237,00 Porsche-

---

*cartel"/German carmakers might face "wave of lawsuits,"* Clean Energy Wire,
https://www.cleanenergywire.org/news/cartel-german-carmakers-might-face-wave-lawsuits.

branded cars. In 2016, Volkswagen AG sold more cars than any other automobile manufacturer in the world. Combined with its other brands, Volkswagen controls a roughly 13% share of the worldwide passenger car market, and a considerably higher share of the American market for European cars. Volkswagen AG's sales revenue in 2016 totaled €217 billion (approximately $255 billion) and sales revenue in 2015 totaled €213 billion (approximately $248 billion).

8.     **Volkswagen Group of America, Inc. ("VWGOA")** is a New Jersey corporation with its principal place of business located at 2200 Ferdinand Porsche Drive, Herndon, Virginia. VWGOA is a wholly-owned subsidiary of Volkswagen AG, and it engages in business, including the advertising, marketing and sale of Volkswagen-branded automobiles, in all 50 states. In 2016 alone, VWGOA sold 322,948 vehicles.

9.     Volkswagen AG develops, manufactures, advertises, markets, warrants, and distributes new automobiles under numerous brand names worldwide (including Lamborghini, Bentley, Bugatti, SEAT, Skoda, as well as Ducati motorcycles, Scania and MAN commercial vehicles, and the Volkswagen, Audi, and Porsche brands). VWGOA advertises, markets, warrants, and distributes new Volkswagen automobiles in all 50 states. Volkswagen AG exerts a close degree of control over the actions of its subsidiaries, including VWGOA. Together, the Volkswagen defendants developed, marketed, and distributed millions of vehicles in the United States since joining the cartel alleged herein, including millions in Virginia alone. They also together developed and disseminated the owner's manuals, warranty booklets, product brochures, advertisements, and other promotional materials relating to the vehicles they sold in Virginia and the rest of the United States, with the intent that these documents would be distributed in all 50 states.

**Audi Defendants**

10.     **Audi AG** is a German corporation with its principal place of business in Ingolstadt, Germany. Audi AG is a subsidiary of Volkswagen AG and is the corporate parent of Audi of America, LLC. Audi AG designs, develops, manufacturers, and sells luxury automobiles. According to Audi AG, it sold 1.87 million cars worldwide in 2016, setting a new sales record, with sales revenues in 2016 totaling €59.3 billion (approximately $69.7 billion). Audi AG's operating profit in fiscal year 2016 was €4.8 billion (approximately $5.63 billion). Volkswagen AG acquired Audi AG's predecessor corporations between 1965 and 1969.

11.     **Audi of America, LLC**, ("Audi America") is a Delaware limited liability company with its principal place of business located at 2200 Ferdinand Porsche Drive, Herndon, Virginia. Audi of America is a wholly-owned U.S. subsidiary of Audi AG, and it engages in business, including the advertising, marketing and sale of Audi automobiles, in all 50 states. In 2016 alone, Audi America sold 210,213 vehicles in the United States.

12.     Audi AG develops, manufactures, advertises, markets, warrants, and distributes new automobiles under the Audi brand worldwide. Audi America advertises, markets, warrants, and distributes new Audi automobiles in all 50 states. Audi AG exerts a close degree of control over Audi America. Together, the Audi defendants developed, marketed, and distributed millions of vehicles in the United States since joining the cartel alleged herein, including hundreds of thousands in Virginia alone. They also together developed and disseminated the owner's manuals, warranty booklets, product brochures, advertisements, and other promotional materials relating to the vehicles they sold in Virginia and the rest of the United States, with the intent that these documents would be distributed in all 50 states.

**Porsche Defendants**

13.     **Dr. Ing. h.c. F. Porsche AG** ("Porsche AG") is a German corporation with its principal place of business in Stuttgart, Germany. Porsche AG designs, develops, manufacturers, and sells luxury automobiles. Porsche AG is a wholly-owned subsidiary of Volkswagen AG. According to Porsche AG, it sold over 237,000 cars worldwide in 2016, setting a new sales record. Sales revenues in 2016 totaled €22.3 billion (approximately $26.2 billion). Porsche AG's operating profit in fiscal year 2016 was €3.87 billion ($4.55 billion).

14.     Porsche AG has had a close relationship with Volkswagen because its founder, Ferdinand Porsche, designed the first Volkswagen Beetle in the 1930s and 1940s. The two carmakers have cooperated on several vehicles in the decades since then. Members of the Porsche family long owned a significant stake in Volkswagen and served on the board, but Porsche AG was a separate and independent corporation until relatively recently. In 2011, Volkswagen AG and Porsche AG consummated a merger agreement that resulted in the Porsche and the related Piech families' holding company maintaining a controlling 52.2% stake in Porsche AG, while Porsche AG became a subsidiary of Volkswagen AG along with the other brands in the Volkswagen portfolio (such as Audi).

15.     **Porsche Cars North America, Inc.** ("PCNA") is a Delaware corporation with its principal place of business located at 1 Porsche Drive, Atlanta, Georgia. PCNA is a wholly-owned subsidiary of Porsche AG, and it engages in business, including the advertising, marketing and sale of Porsche automobiles, in all 50 states. According to Porsche AG, 2016 represented its best annual results in Porsche history in the U.S., with 54,280 automobiles delivered.

6

16.     Porsche AG develops, manufactures, advertises, markets, warrants, and distributes new automobiles under the Porsche brand worldwide. PCNA advertises, markets, warrants, and distributes new Porsche automobiles in all 50 states. Porsche AG exerts a close degree of control over PCNA. Together, the Porsche defendants developed, marketed, and distributed millions of vehicles in the United States since joining the cartel alleged herein, including hundreds of thousands in Virginia alone. They also together developed and disseminated the owner's manuals, warranty booklets, product brochures, advertisements, and other promotional materials relating to the vehicles they sold in Virginia and the rest of the United States, with the intent that these documents would be distributed in all 50 states.

**Daimler Defendants**

17.     **Daimler AG** is a German corporation with its principal place of business in Stuttgart, Germany. It is a major worldwide automaker and is in the business of designing, developing, manufacturing, and selling automobiles. In 2016, Daimler's Mercedes-Benz and Smart brands sold over 2.3 million vehicles worldwide. Daimler's sale revenue in 2016 totaled €153 billion (approximately $180 billion). For Mercedes-Benz brand cars alone, Daimler's sales revenue totaled €89 billion (approximately $105 billion).

18.     **Mercedes-Benz USA, LLC** ("MBUSA") is a Delaware limited liability corporation with its principal place of business at 303 Perimeter Center North, Atlanta, Georgia, although prior to July 2015, MBUSA maintained its principal place of business in Montvale, New Jersey. MBUSA is a wholly-owned subsidiary of Daimler AG, and it engages in business, including the advertising, marketing and sale of Mercedes-Benz automobiles, in all 50 states. In 2016, MBUSA sold 346,451 Mercedes-Benz vehicles in the United States.

19.     Daimler AG develops, manufactures, advertises, markets, warrants, and distributes new automobiles under the Mercedes-Benz, Mercedes-AMG, and Smart brands worldwide (as well as several commercial vehicle brands and MV Agusta motorcycles). MBUSA advertises, markets, warrants, and distributes new Mercedes-Benz, Mercedes-AMG, and Smart automobiles in all 50 states. Daimler AG exerts a close degree of control over MBUSA. Together, the Daimler defendants developed, marketed, and distributed millions of vehicles in the United States since joining the cartel alleged herein, including millions in Virginia alone. They also together developed and disseminated the owner's manuals, warranty booklets, product brochures, advertisements, and other promotional materials relating to the vehicles they sold in Virginia and the rest of the United States, with the intent that these documents would be distributed in all 50 states.

### BMW Defendants

20.     **Bayerische Motoren Werke AG** ("BMW AG") is a German corporation with its principal place of business in Munich, Germany. It is a major worldwide automaker and is in the business of designing, developing, manufacturing, and selling automobiles. BMW AG sold over 2.3 million vehicles worldwide in 2016, of which over 2 million were BMW-branded automobiles. In 2016, BMW AG's sale revenue totaled €86 billion (approximately $101 billion).

21.     **BMW North America, LLC** ("BMW America") is a Delaware limited liability corporation with its principal place of business at 300 Chestnut Ridge Road, Woodcliff Lake, New Jersey. BMW America is a wholly-owned subsidiary of BMW AG, and it engages in business, including the advertising, marketing and sale of BMW automobiles, in all 50 states. In 2016, BMW America sold 365,204 BMW automobiles in the United States.

22.     BMW AG develops, manufactures, advertises, markets, warrants, and distributes new automobiles worldwide under the BMW, Mini, and Rolls-Royce brands (as well as BMW-

brand motorcycles). BMW America advertises, markets, warrants, and distributes new BMW automobiles in all 50 states. BMW AG exerts a close degree of control over BMW America. Together, the BMW defendants developed, marketed, and distributed millions of vehicles in the United States since joining the cartel alleged herein, including millions in Virginia alone. They also together developed and disseminated the owner's manuals, warranty booklets, product brochures, advertisements, and other promotional materials relating to the vehicles they sold in Virginia and the rest of the United States, with the intent that these documents would be distributed in all 50 states.

### III.    JURISDICTION AND VENUE

23.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 based upon the federal antitrust claims asserted under the Sherman Act, 15 U.S.C. § 1 et seq. The Court has personal jurisdiction over Defendants pursuant to 18 U.S.C. §§ 1965(a), (b), and (d).

24.    Venue is proper in this district under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District. Further, Defendants have marketed, advertised, sold, and leased thousands of vehicles, and otherwise conducted extensive business, within this District.

### IV.    FACTUAL ALLEGATIONS

**A.    The German Five and the U.S. Market for German Automobiles**

25.    Together, Volkswagen, Audi, Porsche, Daimler, and BMW are known as the German Five, the oldest and largest auto manufacturers in Germany. There are other automakers in Germany, but the German Five dominate the market for German Automobiles, and are viewed as competitors in the market for German Automobiles worldwide and in the United States. Together, they command a significant share of the overall automobile market in the United States;

focusing on the American market for German Automobiles, however, their collective market share (and market power) is undeniably dominant.

26.     Today, Volkswagen, Audi, and Porsche exist under the same corporate umbrella, but this was not always the case. Volkswagen acquired one of Audi's predecessor corporations from Daimler in 1965, and completed the creation of what is now Audi in 1969. Although Volkswagen and Porsche have maintained a close relationship throughout their existence— because Porsche founder Ferdinand Porsche designed the original Volkswagen Beetle in the 1930s and 1940s—and Ferdinand Porsche's descendants long owned stock in Volkswagen, the two carmakers did not merge until 2011, long after the anticompetitive collusion alleged herein began.

27.     The German Five advertise their vehicles in the United States by emphasizing quality, precision engineering, and industry-leading luxury and technology features.   The advertised combination of world-leading engineering—in terms of quality, performance, technology, and luxury—has set German automobiles apart from the rest of the wider automobile market. The German Five have been able to charge premium prices as a result.

28.     When the German Five collude to limit their competitive advantages over one another—by agreeing to identical or very similar standards, by agreeing to limit technological development or by sharing technology, by covering for each other's emission cheating, or by colluding to lower development costs—the German Five cheat and damage their customers. By refusing to compete and thereby keeping costs of research and development down, the German Five's premium prices and profit margins became artificially high.

29.     The German Five's cartel arrangement exacerbates the already massive barriers to entry in the German Automobiles market in the United States. Research and technological development, as well as manufacturing infrastructure, are tremendously expensive in the

automotive industry. Most new models require a lengthy design, development, and testing phase, as well as new tooling even for existing production lines. Sharing technology and agreeing not to advance in competition with one another among the German Five reduced that expense—for them, but not their competitors—significantly.

30.     The result is that there are few obvious substitutes for the German Five's products, and those that do exist have not been able to compete with the German Five's prices while maintaining profitability. This is true even if this case is viewed against a broader market for European Automobiles in the United States.  Sweden, Italy, and the United Kingdom all boast several automobile manufacturers that might be considered competitors in the American market for technologically advanced, luxurious, or high-performing European Automobiles (although notably, none maintain the German Five's reputation for reliability). But each of the plausible competitors in the European Automobile market has been crushed by the German Five in one way or another since collusion began in 1996.

31.     Volvo and Saab, the most direct competitors to the German Five in the American market for European Automobiles, have both undergone a series of unprofitable periods, acquisitions, and bankruptcies since the cartel behavior alleged herein began. After a period under Ford control, Volvo is now owned by a Chinese conglomerate and still sells cars in the American market, but its market share has declined over time. Saab was once owned by General Motors but has since left the American market completely.

32.     The United Kingdom's car manufacturers have either suffered similar struggles to Volvo and Saab or have been acquired by the dominant German Five. Jaguar, Land Rover, and Aston Martin, like Volvo, were once owned by Ford. Like Volvo, and even with Ford's existing dealer and distribution infrastructure in the United States, they were seldom profitable. In 2007,

Ford sold Aston Martin. In 2008, Ford sold Jaguar and Land Rover to Tata Motors, an Indian automaker. Meanwhile, BMW AG acquired the parent of British automaker Mini in 1994, broke up the group in 2000, retaining only Mini, and brought Mini automobiles to the United States for the 2002 model year, advertising that the new BMW-developed Mini automobiles would boast BMW engineering. Volkswagen AG acquired Bentley and the then-related Rolls-Royce automobile business in 1998, but then sold the Rolls-Royce automobile business to BMW AG in 2003. Thus, Volkswagen AG has manufactured, advertised, and sold Bentley- branded vehicles since 2003, while BMW AG licenses the Rolls-Royce trademarks and has manufactured, advertised, and sold Rolls-Royce branded vehicles since 2003.

33.     Italy's Alfa Romeo left the American market in 1995, and finally returned recently after corporate parent Fiat acquired American automaker Chrysler and itself reentered the American market, using Chrysler's existing dealer and distribution network. Still, Alfa Romeo's European Automobile market share is minuscule. At the highest end of the market, Ferrari and Maserati vehicles (close corporate relations of Fiat) are sold in small numbers in the United States; but Volkswagen AG acquired their most significant competitors in the United States, Lamborghini (in Italy) and Bugatti (in France) in 1998.

34.     Bugatti is the only French automobile brand sold in the United States, despite the large French auto industry. Renault, Peugeot, and Citroen all formerly sold cars in the United States and have considered returning to the market, but all have been kept out by the high barriers to entry that have been significantly exacerbated by the German Five's anticompetitive behavior.

35.     The result of the German Five's collusion since the 1990s, therefore, has been the near- complete dominance of the markets for German Automobiles and, more broadly, European Automobiles in the United States. The Defendants' competitors have rarely turned a profit in the

United States during that period, or have left the market and been unable to return. Most have undergone a crushing series of acquisitions and bankruptcies, with the most stable and profitable being those that are now owned by the German Five. For automobile dealers like Plaintiff and Class members, this means that there is limited choice in the market. Even where there is a choice between comparable models, the differences among vehicles are largely illusory. Because they effectively share the costs of technological innovation, the German Five offer supra-competitive pricing both coming and going: they charge a premium for their purported quality and engineering, and are extremely profitable, and yet they are still able to undercut their competitors' pricing for comparable models, because their competitors would be unable to turn a profit even at the German Fives' premium prices.

**B.     The German Five Have Colluded for Over Two Decades**

36.     According to public reports detailing their secret, illegal conspiracy, the German Five have been colluding for over two decades, pretending to compete while charging high prices for German engineering and innovation, all the while secretly sharing information to keep their own costs down.

37.     The German automakers have a legal way to share some information. It is called the Verband der Automobilindustrie (German Association of the Automotive Industry or VDA).[2] The VDA has over 600 members, including auto manufacturers like Defendants, Opel, Fiat's and

---

[2] Caspar Busse, Thomas Fromm, & Wolfgang Janisch, *Wenn Firmen reden, kann es schnell heikel warden*, Süddeutsche Zeitung (July 25, 2017), http://www.sueddeutsche.de/wirtschaft/autoindustrie- wenn-firmen-reden-kann-es-schnell-heikel-werden-1.3600991.

Ford's German divisions, and numerous manufacturers of trucks, buses, and commercial vehicles.[3] It also includes over 500 suppliers of auto parts.

38.   However, this industry group was not exclusive enough for the Defendants. Since the 1990s, Defendants Volkswagen, Porsche, Audi, Daimler, and BMW have been holding covert meetings to share information away from the VDA's watch[4] and to coordinate behavior in the VDA meetings.[5] In an email obtained by Der Spiegel, Audi referred to an upcoming meeting of this smaller group as "secret."[6]

39.   Volkswagen has admitted that it participated in these covert meetings with Audi, Porsche, Daimler, and BMW.[7] These meetings began in the 1990s and were divided into five main areas: drive, set-up, chassis, electricity/electronics, and total vehicle.[8] Within these five areas, the Defendants formed sixty different task forces to collude on virtually every aspect of automotive development and manufacturing.[9] For example, these working groups focused on various aspects

---

[3] Verband der Automobilindustrie, "Members," http://www.vda.de/en/association/members.html (last visited September 29, 2017).

[4] Bertel Schmitt, *Dieselgate Product of Vast Volkswagen-BMW-Daimler Car Cartel Conspiracy, Fresh Report Says*, Forbes (July 22, 2017), https://www.forbes.com/sites/bertelschmitt/2017/07/22/dieselgate-product-of-vast-vw-bmw-daimler- car-cartel-conspiracy-fresh-report-says/#1dd8d5797ce8.

[5] Max Hägler and Klaus Ott, *Lieber kungeln als konkurrieren*, Süddeutsche Zeitung (July 25, 2017), http://www.sueddeutsche.de/wirtschaft/autoindustrie-lieber-kungeln-als-konkurrieren-1.3600989; see also Statement by the German Association of the Automotive Industry (VDA), VDA (July 24, 2017), https://www.vda.de/en/press/press-releases/20170724-statement-by-the-german-association-of-the- automotive-industry--vda-.html.

[6] Frank Dohmen, *The Auto Syndicate: Volkswagen, Audi, Porsche, BMW, and Daimler formed a cartel for years; One of the largest in German Economic History*, Der Spiegel (July 22, 2017), 2017 WLNR 22319248. This article is in German. The quotations and references throughout this Complaint are based on translations.

[7] *Id.*

[8] *Id.*

[9] *Id.*

14

of vehicles, such as mechanical components, brake control systems, seat systems, air suspension, clutches, gasoline engines, diesel engines, and emissions technology.

40.     More than two hundred of the Defendants' managers and engineers attended these meetings over the course of two decades.[10] Over the last five years alone, the Defendants have secretly met more than 1,000 times.[11]

### 1.     Defendants' Collusion Was Far Reaching

41.     Collaboration is not always forbidden. The German Association of the Automotive Industry (VDA) has published guidelines on acceptable collaboration and provided examples of unacceptable topics including price and price strategies, delivery and payment terms with customers and suppliers, and information on company strategies and future market behavior. The secret meetings in this case went far beyond the limited areas envisioned by the VDA or allowed by law.

42.     Volkswagen has stated that "[i]t is quite common for car manufactures all over the world to engage in an exchange on technical issues in order to accelerate the pace and quality of innovations." But Volkswagen itself admitted that the information it and other Defendants exchanged was proprietary, competitively sensitive technical data. And far from accelerating the pace and quality of innovation, Defendants colluded to limit technological progress and competition: they agreed on jointly defined "technical standards" and agreed to use "only certain technical solutions" in new vehicles. The Defendants agreed that no one company should have technology far ahead of the other members of the cartel.

---

[10] *Id.*
[11] *Id.*

43.     Instead of competing to see who could offer the best technology to consumers to set themselves apart and justify the premium prices charged for "German engineering," the Defendants agreed that if one company obtained a breakthrough and was able to improve their technology, the others must be able to offer the same technology relatively quickly. Exchanging this type of competitively sensitive technical data reduces or eliminates uncertainty about the current or future market behavior of the competitors and undermines the very underpinnings of a free market economy.

44.     Commonly, in the automotive industry, competitors analyze one another's cars by purchasing them on the open market, driving them, and taking them apart. However, the Defendants here did not act like competitors. Instead, they freely exchanged technical data among themselves before bringing it to market and even agreed to limit the technology they would use. This giving and taking was the motto of the group according to an employee, who noted that it was simply part of the "friendly way" that the Defendants worked together at these meetings.[12]

### 2.     Defendants Benefitted by Cheating Customers and Regulators.

45.     The meetings went well beyond normal information sharing by competitors. For example, in September of 2008, the Defendants met to discuss a "coordinated approach" to diesel emissions controls, and agreed to use only 8-liter tanks of the urea solution used to catalyze diesel exhaust and reduce emissions of certain pollutants.[13] These tanks neutralize the NOx emitted by diesel engines, making it safer for humans to breathe. Making the tanks this small would save the Defendants "up to 80 EUR [$93] per vehicle."[14] In an internal presentation, Audi stated that it was

---

[12] *Id.*
[13] *Id.*
[14] Schmitt, *supra* note 3.

clear that a commitment from the German automotive manufactures has been reached at Board level.

46.     The problem was that the Defendants knew that an 8-liter tank was insufficient. If the NOx was properly neutralized, the consumers would have to refill the tank every 3,700 miles, well before the car was due for an oil change. A document reportedly written by Audi explained that "Daimler, Volkswagen, and BMW concur" that the required size of the tank, in order to achieve the desired service interval, was at least 19 liters. However, the Defendants also agreed that the price of this larger tank was "clearly too high." An Audi manager wrote that a "coordinated future scenario was urgently needed." Therefore, in June of 2010, the Defendants agreed to cap their urea tanks at 8 liters. Volkswagen has since admitted to solving the refill problem by cheating on emissions tests and polluting the air. Daimler has been accused of doing the same.

47.     This agreement did not just save the Defendants money. It also helped them continue to fool regulators and cheat consumers like Plaintiff and Class Members. For example, in May of 2014, Audi warned the rest of the Defendants that getting into "an arms race of tank sizes" should be avoided as much as possible, because regulators would become suspicious as to why the tanks had to become larger if the smaller ones were sufficient.[15]

48.     Emission after-treatment was not the only area of collusion. As Der Spiegel reports, "[t]he system of agreements covered almost all areas of automotive development."[16]

49.     This collusion occurred even in areas that appear small. For example, the Defendants met and voted on the maximum speed at which the convertible roof of a car should open or close. Volkswagen, Audi, Porsche, Daimler, and BMW all agreed not to compete with

---

[15] Dohmen, *supra* note 5.
[16] *Id.*

each other as to whose convertible could open or close at the fastest speed.[17] This allowed them to save money and weight and reduce their technical risk, at the expense of consumers who would not benefit from the natural free market incentives towards constantly improving products. This is not mere speculation: companies like Ford that were competing with the German automakers were actively working to improve their convertible roofs at the same time.[18]

## C. Economic Principles Illustrate the Effect of the German Five's Collusion: Higher Prices for American Automobile Dealers.

50. As alluded to above, the conditions that enable competitors to collude existed in the German Automobile market for decades. For instance, significant barriers to entry, a relatively low number of firms controlling significant shares of the markets (*e.g.*, luxury and diesel vehicles), and readily observable prices and products (which enable colluders to punish a firm that deviates from the collusive strategy by reducing prices) are characteristics of markets in which collusion may readily occur.

51. From an economic perspective, the German Five's collusion at a minimum enabled Defendants to achieve excess profits through costs savings by stifling innovation. In a competitive market, less innovative products sell at lower prices, all else being equal. As such, a firm opting to reduce costs by offering less innovative features would have to accept lower prices, as more innovative competitors are able to sell to those customers who are willing to pay for the innovative features (often at a premium). In a competitive automobile manufacturing market, where companies introduce product improvements every year, the effects of failing to innovate

---

[17] *Id.*

[18] *Ford improves top design on its 2015 Mustang convertible*, Autoweek (March 2, 2014), http://autoweek.com/article/car-news/ford-improves-top-design-its-2015-mustang-convertible (mentioning that Ford made "welcome" improvements to its convertible, including halving the time it takes to open the top).

compounds each year, such that the price gap between innovative and non-innovative products widens over time.

52.     By colluding, the German Five were able to flip these economic principles on their head, permitting Defendants to charge higher prices for less innovative products, relative to a competitive market environment.   For example, in a competitive market environment, manufacturers would have the incentive to maximize the size of the tanks that store the AdBlue solution used to reduce nitric oxides, since this would reduce the frequency with which customers are required to refill the tank (to the benefit of the consumer) and thereby give them a competitive advantage.  While the size of the tank would be subject to engineering constraints of the vehicles (e.g. space for other features, performance, etc.), vehicles with larger tanks would command higher prices than those with smaller tanks (up to the point of diminishing marginal returns), all else being equal.  Accordingly, manufacturers offering smaller tanks would face competition from innovative manufacturers offering larger tanks (the smaller tanks would have to be refilled more often and as such represent a higher consumer cost of ownership), thereby reducing the price a manufacturer could charge for a vehicle with a smaller tank.

53.     The optimal, least cost, size of the AdBlue tank is a feature on which automakers would compete in a non-collusive environment.   Thus, competition increases innovation by providing an incentive for manufacturers to provide optimally-sized tanks without affecting other features (or the incentive to eliminate the need for additive tanks altogether).  At the same time, competition restrains prices so that vehicles with less innovative technology (*e.g.*, smaller AdBlue tanks) command lower prices.

54.     The German Five's joint decision to limit the size of the AdBlue tanks is an example of how they were able to realize higher prices and higher profit margins for less innovative vehicles

through collusion.  By removing a feature on which they otherwise would have competed, the German Five were free to offer vehicles with smaller tanks without having to reduce prices in anticipation of competition from innovative competitors.  At the same time, the smaller tanks saved the German Five up to €80 per vehicle.  While such a cost reduction would have been passed along to consumers and dealers in a competitive market (in the form of lower prices), the German Five's collusive behavior enabled them to retain these savings in the form of higher profits.

55.     The size of the AdBlue tanks is only one of numerous features on which the German Five may have stifled innovation and, therefore, competition.  By diminishing the universe of features on which they competed, the German Five were able to charge higher prices to dealers and consumers while, at the same time, saving money that would have been spent on research, development, and integration of innovative features.  As a result, the collusive behavior most likely enhanced the German Five's profits at the expense of automobile dealers like Plaintiff and the Class members.

**D.     Defendants Knew That Their Conspiracy Was Illegal**

56.     The Defendants were not willing to share highly sensitive, technical information with manufacturers outside of their secret group. In fact, Defendants actively worked to ensure that these secret meetings remained private. When Jaguar, Volvo, Renault, and Fiat reached out to share information, they were rejected. Similarly, despite their membership in the VDA and participation in the German automotive market, Ford, Opel, Fiat, and others were not invited to the meetings.[19]

57.     Defendants reportedly understood that they were violating competition laws in Germany and abroad. When they rejected information requests from other car companies, they

---

[19] Schmitt, *supra* note 3.

expressed concerns that these meetings may be reported to the German Cartel Office.[20] Defendants became more secretive and careful. On October 1, 2010, leaders at a meeting in Paris reminded the others not to record anything particularly delicate in writing.[21]

58.     In 2011, the European Commission fined Daimler almost 1.1 billion euros for its membership in a truck cartel that also included Volkswagen subsidiary MAN.[22] After that, Daimler reportedly became nervous about the secret meetings with Volkswagen and BMW, and it reportedly trained 654 executives in German cartel law. However, managers refused to stop the meetings because "otherwise [they] cannot sell cars anymore." Daimler continued to attend the meetings, although it reportedly stayed away from certain meetings which were regarded as "particularly problematic."[23] Similarly, in September of 2011, Daimler deleted the last two slides from a presentation it planned to give at one of these secret meetings after concluding that there were strong antitrust concerns relating to the information it had planned to share.[24]

**E.     Volkswagen Reports the Illegal Conspiracy.**

59.     The German Five's cartel meetings were kept secret from the American public until Der Spiegel obtained information about an ongoing German investigation in July 2017. According to Der Spiegel, on June 23, 2016, the German Federal Cartel Office (Bundeskartellamt) conducted a search in connection with an investigation into a steel cartel, including suppliers who sell to auto manufacturers like Volkswagen, and seized documents.[25]

---

[20] Dohmen, *supra* note 5.
[21] Hägler, *supra* note 4.
[22] Klaus Ott, *Wie die Autokonzerne alle Warnsignale ignorierten*, Süddeutsche Zeitung (July 24, 2017), http://www.sueddeutsche.de/wirtschaft/auto-kartell-wie-die-autokonzerne-alle-warnsignale-ignorieren-1.3599806.
[23] *Id.*
[24] Dohmen, *supra* note 5.
[25] *Id.*

60.     Shortly thereafter, on July 4, 2016, Defendant Volkswagen reported itself to the European Commission, explaining that it suspected that it may have violated antitrust and competition laws.[26] Reportedly, Volkswagen suspected that its collusion with Daimler and BMW was about to be revealed and wanted to receive favorable treatment in exchange for reporting it first.[27] However, later information revealed that Daimler had also recognized that it was violating German law and reported itself to German authorities as early as 2014.[28] Daimler may have self-reported its membership in the cartel in 2014, but it did not report the conspiracy related to diesel emissions controls.

61.     The timing of these admissions may matter to the German Cartel Office, but does not undo the harm that these companies have caused to United States businesses like Plaintiff and the Class members by conspiring together and failing to compete for more than two decades.

**F.     Plaintiffs and Class Members Paid Artificially High Prices for German Automobiles.**

62.     Plaintiff and the Class members are all current or former dealers of German Automobiles.   Dealers purchase new cars directly from the German Five automobile manufacturers.   Throughout the class period alleged below, Plaintiff and the Class members suffered significant damages as a result of the German Five's unlawful conspiracy.  Plaintiff and the Class members purchased German Automobiles at prices far exceeding the amount they would have paid in a competitive market—a market where the German Five were not colluding on virtually every aspect of automotive engineering.

---

[26] *Id.*

[27] *Under German law, the first member of a cartel to self-report can avoid paying any fines.* Bertel Schmitt, German Car Cartel Trigger Rat-Out-Race Between Daimler, Volkswagen and BMW, Forbes (July 25, 2017), https://www.forbes.com/sites/bertelschmitt/2017/07/25/german-car-cartel-triggers-rat- out-race-between-daimler-volkswagen-and-bmw/2/#5e1573e35a79.

[28] *Id.*

## V.     CLASS ACTION ALLEGATIONS

**A.     Class Definition**

63.     Pursuant to the provisions of Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, Plaintiff brings this action seeking damages and equitable and injunctive relief under section 1 of the Sherman Act, 15 U.S.C. § 1, and section 4 of the Clayton Act, 15 U.S.C. § 15, on behalf of himself and the following class:

> All persons or entities in the United States (including its territories and the District of Columbia) who purchased German Automobiles directly from any of the Defendants at any time during the period January 1, 1996, through the present.  German Automobiles include all vehicles manufactured and sold or leased in the United States by a Defendant or any current or former subsidiary of a Defendant.

Excluded from this "Direct Purchaser Class" are the defendants, and their officers, directors, management, employees, subsidiaries, and affiliates, and all federal governmental entities. Plaintiff reserves the right to revise the Class Definition based upon information learned through discovery.

**B.     Class Certification Requirements Under Rule 23**

64.     **Numerosity: Rule 23(a)(1).** The members of the Direct Purchaser Class are so numerous and geographically dispersed that individual joinder of all Direct Purchaser Class members is impracticable. Plaintiff is informed and believes that the members of the Direct Purchaser Class number in the thousands. The precise number of Direct Purchaser Class members may be ascertained from Defendants' records. Direct Purchaser Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, social media, and published notice.

65.     **Commonality and Predominance: Rules 23(a)(2) and 23(b)(3).** This action involves significant common questions of law and fact, which predominate over any questions affecting individual Direct Purchaser Class members, including, but not limited to:

a.  Whether Defendants engaged in the conduct alleged herein;

b.  Whether Defendants designed, advertised, marketed, distributed, leased, sold, or otherwise placed German Automobiles into the stream of commerce in the United States;

c.  Whether Defendants agreed to share regularly with each other detailed, nonpublic, and/or competitively sensitive data about current and prospective technology, prices, and market strategy;

d.  Whether Defendants agreed to reduce or collaborate on the speed of technological innovation in German automotive engineering;

e.  Whether Defendants' collusion resulted in the sale of inferior German Automobiles;

f.  Whether Defendants conspired to artificially inflate the prices of the German Automobiles;

g.  Whether Plaintiff and the other Direct Purchaser Class members had fewer vehicle choices than they would have had if Defendants had not engaged in the conduct alleged herein;

h.  Whether Plaintiff and the other Direct Purchaser Class members overpaid for their German Automobiles as a result of Defendants' collusion;

i.  The identity of the participants and co-conspirators in the scheme alleged herein;

j.  Whether Defendants made material misrepresentations and/or concealed facts regarding the true nature of their relationships with each other;

k.  Whether Defendants' concealment of the true nature of the relationship between the Defendants would have induced a reasonable consumer to act to his or her detriment by purchasing and/or leasing German Automobiles;

l.  Whether Defendants' conduct violates the Sherman and Clayton Acts;

m.  Whether Plaintiff and Direct Purchaser Class members had reason to know of or suspect the Defendants' conduct or means to discover the collusion;

n.  Whether Defendants fraudulently concealed their conduct from Plaintiff and Direct Purchaser Class members;

o.  Whether Plaintiff and Direct Purchaser Class members were injured in their business or property by Defendants' conduct;

p.  Whether Plaintiff and Direct Purchaser Class members are entitled to equitable relief, including, but not limited to, restitution or injunctive relief; and

q.  Whether Plaintiff and Direct Purchaser Class members are entitled to damages and other monetary relief and, if so, in what amount.

66.  **Typicality: Rule 23(a)(3).** Plaintiff's claims are typical of the claims of the Direct Purchaser Class members whom it seeks to represent under Federal Rule of Civil Procedure 23(a)(3), because Plaintiff and each Class member directly purchased German Automobiles and were similarly injured as a direct and proximate result of the same wrongful practices by Defendants. Plaintiff's claims arise from the same practices and courses of conduct that give rise to the claims of the other Direct Purchaser Class members. Plaintiff's claims are based upon the same legal theories as the claims of the other Direct Purchaser Class members.

67.  **Adequacy: Rule 23(a)(4).** Plaintiff will fairly and adequately represent and protect the interests of the Direct Purchaser Class members as required by Federal Rule of Civil Procedure

23(a)(4). Plaintiff has retained counsel competent and experienced in complex class action litigation, including litigation against automobile manufacturers. Plaintiff intends to prosecute this action vigorously. Neither Plaintiff nor his counsel have interests that conflict with the interests of the other Direct Purchaser Class members. Therefore, the interests of the Direct Purchaser Class members will be fairly and adequately protected.

68.     **Declaratory and Injunctive Relief: Rule 23(b)(2).** Defendants have acted or refused to act on grounds generally applicable to Plaintiff and the other members of the Direct Purchaser Class, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Direct Purchaser Class as a whole.

69.     **Superiority: Rule 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The burden and expense that would be required to individually litigate the Direct Purchaser Class claims against Defendants would be impracticable for members of the Direct Purchaser Class to individually seek redress for Defendants' wrongful conduct.

70.     Even if Direct Purchaser Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

## VI.    STATUTES OF LIMITATION ARE TOLLED

### A.    Discovery Rule

71.    Plaintiff and members of the Direct Purchaser Class did not discover, and could not have discovered through the exercise of reasonable diligence, that Defendants were secretly meeting and colluding on numerous aspects of their vehicles, that Defendants were concealing and misrepresenting the true nature of the "competition," or lack thereof, that was ongoing between the Defendants to the driving public, and/or that the Defendants were using these secret meetings to artificially inflate prices to direct purchasers, lower their own supplier costs, and reduce or control technological advancement.

72.    Plaintiff and members of the Direct Purchaser Class had no realistic ability to discover the presence of this collusion, or to otherwise learn of the Defendants anticompetitive behavior, until it was discovered and reported by *Der Spiegel* on July 21, 2017.

73.    Any statutes of limitation otherwise-applicable to any claims asserted herein have thus been tolled by the discovery rule.

### B.    Fraudulent Concealment

74.    All applicable statutes of limitation have also been tolled by Defendants' knowing, active and ongoing fraudulent concealment of the facts alleged herein.

75.    Defendants have known of these secret, anticompetitive meetings since the 1990s when the Defendants began having them. Since then Defendants have intentionally concealed them from, or failed to notify, regulators, Plaintiff, Direct Purchaser Class members, and the driving public.

76.    Despite knowing about their anticompetitive behavior for this entire period, Defendants did not acknowledge the problem to the public, and in fact actively concealed it, until

after *Der Spiegel* published the exposé. Defendants still deny that these meetings were in violation of the laws.

77.     Any otherwise-applicable statutes of limitation have therefore been tolled by Defendants' exclusive knowledge and concealment of the facts alleged herein.

**C.      Estoppel**

78.     Defendants were, and are, under a continuous duty to disclose to Plaintiff and Direct Purchaser Class members the true nature of their relationship with the other Defendants. This is underscored by the contrast between Defendants' misleading statements to the public—both in advertising and in public statements by executives about the virtues of competition—and their internal acknowledgement that the meetings were secret and potentially illegal. Instead, Defendants actively concealed the nature of their relationship with other Defendants and the effect that relationship had on the prices and technology in German Automobiles and knowingly made misrepresentations about the same.

79.     Plaintiff and Direct Purchaser Class members reasonably relied upon Defendants' active concealment of these facts that rendered their statements misleading.

80.     Based on the foregoing, Defendants are estopped from relying on any statutes of limitation in defense of this action.

**VII.     CLAIM FOR RELIEF**

**Violation of the Sherman Act (15 U.S.C. §§ 1–7) and the Clayton Act (15 U.S.C. §§ 12–27). (Conspiracy in Restraint of Trade)**

81.     Plaintiff and the Direct Purchaser Class hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

82.     Beginning at a time presently unknown to Plaintiff and the Direct Purchaser Class, but at least as early as January 1, 1995 and continuing through the present, Defendants entered into a continuing agreement, understanding, and conspiracy in restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and the Clayton Act, 15 U.S.C. § 12, *et seq*.

83.     In furtherance of the unlawful conspiracy, each of the Defendants has committed overt acts, including, *inter alia*:

    a.   Agreeing to fix, increase, maintain and/or stabilize prices of German Automobiles sold in the United States;

    b.   Participating in meetings, conversations, and communications with co-conspirators regarding every aspect of automotive engineering in an effort to fix, increase, maintain, and/or stabilize prices of German Automobiles sold in the United States;

    c.   Agreeing to not compete over automobile features and components in an effort to in an effort to fix, increase, maintain, and/or stabilize prices of German Automobiles sold in the United States;

    d.   Agreeing to standardize automobile features and component parts so as to restrict competition, maintain anticompetitive profit margins, and overcharge Plaintiff and members of the Direct Purchaser Class and the public; and

    e.   Meeting with co-conspirators in order to keep the existence of the conspiracy unknown so as to foster the illegal anti-competitive conduct described herein.

84.     The combination and conspiracy alleged herein has had the following effects, among others:

    a.   Price competition in the sale of German Automobiles sold in the United States by Defendants has been restricted;

b. Prices for German Automobiles sold in the United States by Defendants have been fixed, raised, maintained, and/or stabilized at artificially high, non-competitive levels;

c. Defendants have fixed, raised, maintained, and/or stabilized artificially high profit margins, to the detriment of Plaintiff and the Direct Purchaser Class; and

d. Plaintiff and members of the Direct Purchaser Class have been deprived of the benefits of free and open competition;

85. Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating unlawful arrangements to fix, maintain, raise and/or stabilize prices of German Automobiles sold in the United States.

86. As a direct and proximate result of Defendants' illegal agreement, contract, combination trust, and/or conspiracy, Plaintiff and members of the Direct Purchaser Class have been injured and damaged in their respective businesses and property in an amount to be determined according to proof and are entitled to recover threefold the damages sustained pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15.

87. The conduct of Defendants constitutes a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

## PETITION FOR RELIEF

WHEREFORE, Plaintiff and the Direct Purchaser Class petition that:

A. The Court determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, that Plaintiff be appointed class representative and that Interim Co-Lead Counsel for the Proposed Direct Purchaser Class be appointed as lead counsel for the Class.

B.     The Court adjudge and decree that the acts of the Defendants are illegal and unlawful, including the agreement, contract, combination, or conspiracy, and the acts done in furtherance thereof by Defendants and their co-conspirators be adjudged to have been a per se violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and that Judgment be entered against Defendants, jointly and severally, and in favor of Plaintiff and members of the Direct Purchaser Class for treble the amount of damages sustained by Plaintiff and the Direct Purchaser Class as allowed by law, together with costs of the action, including reasonable attorneys' fee, pre- and post-judgment interest.

C.     Each of the Defendants, and their respective successors, assigns, parent, subsidiaries, affiliates, and transferees, and their officers, directors, agents, and representatives, and all other persons acting or claiming to act on behalf of Defendants or in concert with them, be permanently enjoined and restrained from, in any manner, directly or indirectly, continuing, maintaining or renewing the combinations, conspiracy, agreement, understanding, or concert of action as alleged herein.

D.     The Court award Plaintiff and members of the Direct Purchaser Class such other and further relief as may be necessary and appropriate.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiff and the Direct Purchaser Class demand a jury trial as to all issues triable by a jury.

Dated:  November 14, 2017                                   Respectfully Submitted,

                                                           /s/ *Michelle A. Parfitt*
                                                           Michelle A. Parfitt, Esq.
                                                           (VSB # 33650)
                                                           ASHCRAFT & GEREL, LLP

4900 Seminary Road, Suite 650
Alexandria, Virginia 22311
Tel: (703) 931-5500
Fax: (703) 820-1656
Mparfitt@ashcraftlaw.com

Warren T. Burns
Daniel H. Charest
Will Thompson
BURNS CHAREST, LLP
900 Jackson Street, Suite 500
Dallas, Texas 75202
Tel: (469) 904-4550
Fax: (469) 444-5002
wburns@burnscharest.com
dcharest@burnscharest.com
wthompson@burnscharest.com

Korey A. Nelson
Amanda Klevorn
BURNS CHAREST, LLP
365 Canal Street, Suite 1170
New Orleans, Louisiana 70130
Tel: (504) 799-2845
Fax: (504) 881-1765
knelson@burnscharest.com
aklevorn@burnscharest.com

Thomas P. Thrash
Cydni Arterbury, Legal Assistant
THRASH LAW FIRM, P.A.
1101 Garland Street
Little Rock, AR 72201
Tel: (501) 374-1058
Fax: (501) 374-2222
tomthrash@thrashlawfirmpa.com

Isaac L. Diel
SHARP MCQUEEN, PA
Financial Plaza
6900 College Blvd, Suite 285
Overland Park, Kansas 66211
Tel: (913) 661-9931
Fax: (913) 661-9935
Email: idiel@sharpmcqueen.com

Charles D. Gabriel
CHALMERS BURCH & ADAMS, LLC
North Fulton Satellite Office
5755 North Point Parkway, Suite 96
Alpharetta, Georgia 30022
Tel: (678) 735-5903
Fax: (678) 735-5905
cdgabriel@cpblawgroup.com

Larry D. Lahman
MITCHELL DECLERCK
202 West Broadway Avenue
Enid, OK 73701
Tel: (580) 234-5144
Fax: (580) 234-8890
larry.lahman@sbcglobal.net

Stephen B. Murray, Sr.
MURRAY LAW FIRM
650 Poydras Street, Suite 2150
New Orleans, Louisiana 70130
Tel: (504) 525-8100
Fax: (504) 584-5249
smurray@murray-lawfirm.com